## ÆOLIAN CO. v. SCHUBERT PIANO CO.

### (Circuit Court of Appeals, Second Circuit. June 13, 1919.)

#### No. 197.

1. PATENTS ☞328—FOR MUSIC SHEET GUIDE VALID AND INFRINGED.

The Thomson patent, No. 841,356, for a music sheet guiding device for mechanical piano and organ players, *held* to cover a patentable improvement on prior devices, and entitled to a fair construction and a reasonable range of equivalents; also *held* infringed.

2. PATENTS ☞289—SUIT FOR INFRINGEMENT NOT BARRED BY LACHES.

A delay of four or five years after defendant's device was placed on the market *held* not such laches as barred a suit for infringement.

Ward, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Æolian Company against the Schubert Piano Company. Decree for defendant, and complainant appeals. Reversed.

Louis W. Southgate, George D. Beattys, and E. W. Scherr, Jr., all of New York City, for appellant.

J. Edgar Bull and C. A. Weed, both of New York City, for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. [1] In order that there may be a clear understanding of the patent in suit and its contribution to the art, it is well to consider music sheet guiding devices and the musical instruments, such as the organ or piano, which play automatically and upon which it is used. An automatic piano or organ is constructed by having a series of little motors incorporated therein, each of which is connected to operate one particular action or sound-producing mechanism. One of its features is a tracker bar. This is a smooth piece of metal having a series of little apertures in transverse line. Each aperture is connected to control one of the motors. A perforated music sheet is drawn longitudinally over the tracker. The music sheet consists of a long strip of paper having a series of perforations cut therein corres-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ponding in arrangement and spacing to the notes of the music composition which is to be rendered. Which notes are to be played is determined by the lateral positions of the perforations in the music sheets, and the length of the various perforations determine the time the particular note shall be held. The music sheet roll consists of a spool upon which the perforated music sheet is wound up. These music rolls are sold and treated as compositions, and can be played interchangeably in the instrument. The end of the perforated music sheet is connected to a winding roll arranged below the tracker bar, which roll is rotated by a motor. As a perforated note sheet is drawn longitudinally forward over the smooth face of the apertured tracker, the perforations in the music sheet will uncover, in sequence, the corresponding apertures in the tracker; thus the notes of the instrument will be played in the order of the cutting of the perforations in the music sheet and the musical composition will be rendered. After playing the perforated music sheets, the sheet is drawn longitudinally backward and rewound on the spool.

The music sheet of standard arrangement is eleven and one-fourth inches wide and is so arranged as to accommodate eighty-eight apertures in line in the tracker, and therefore eighty-eight notes of the piano may be played. The construction provides metallic bridges between the apertures in the tracker bar of about one-fiftieth of an inch. In organs of the Æolian type, such as the inventor Thomson purchased as hereinafter stated, a music sheet of ten and one-eighth inches wide is employed and the tracker has one hundred and sixteen apertures. It would be recognized at once that, if the perforated music sheet during its longitudinal forward travel should slip sideways or deflect longitudinally a greater distance than one of the minute bridges between two adjacent apertures in the tracker, a given perforation in the music sheet would uncover, not only its proper aperture in the tracker, but the one adjacent thereto, and thus discord would be produced. The need, therefore, to keep the music sheet during its longitudinal travel forward in correct lateral position on the tracker required an appliance to instantly correct any deflection, so that the continued forward longitudinal travel of the music sheet would always be in correct lateral position on the tracker. The purpose of the appellant's invention, a music sheet guiding device, is to cause the perforated music sheet to travel longitudinally forward over the apertured tracker, always in exact sidewise register and to correct any sidewise deflection thereof before discord can be produced. The guiding device is used only when the music sheet is moving forward, or, in other words, while the piano is playing. When the music sheet is being rewound around the spool or moving longitudinally backward, the guiding device is thrown out of operation; the backward movement is at high speed. A device to accomplish these objects must necessarily be a very delicate and nicely operated piece of mechanism, for it works on a moving strip of perforated paper, which it must keep in correct lateral position within the dimensions of a bridge in minute measurement.

The pioneer inventor of the music sheet guiding device was O'Connor. He had granted to him patent No. 789,053, on May 2, 1905, and

two reissues thereof, No. 13,283, August 15, 1911, and No. 13,398, April 2, 1912. They have been the subject of litigation and were before this court in Autopiano Co. v. Amphion Piano Co., 186 Fed. 159, 108 C. C. A. 291, Autopiano Co. v. American Co., 222 Fed. 276, 138 C. C. A. 38, and Autopiano Co. v. Claviola Co., 234 Fed. 314, 148 C. C. A. 216. Instruments of this character, known in the art, work pneumatically. The pneumatic operation has taken the form of, first, the pressure system, which employs air pressure above that of the atmosphere; and the other, a suction system, which employs air exhaust below that of the atmosphere. These systems, known equivalents, are both used as the manufacturer desires. The suction system is employed on player pianos, and the pressure system is commonly employed on organs. The O'Connor construction, referred to, works on the suction plan. Since O'Connor was the pioneer inventor, we will refer to his construction.

It is the claim of the appellant that the Thomson patent is an improvement on the O'Connor. O'Connor adjustably secured a block to the right-hand part of the tracker, which block had an opening called a control or guiding opening, and which block was adjusted so that the control opening would come just under the right-hand surface of the music sheet. This control opening connected by a tube to control a valve arranged to connect and disconnect the suction chest through another tube, with an actuating pneumatic arranged on the right-hand end of the tracker, and connecting to the right-hand end of the shaft of the music sheet roll. While the music sheet is traveling longitudinally, if it should wander to the left, this right-hand control opening is uncovered, the valve opens the suction chest connecting to the actuating pneumatic, which then is deflected to pull the music sheet roll to the right, and hence adjust the traveling music sheet to the right, to remedy its deflection to the left. So as to provide operation in the other direction, there was adjustably mounted another block on the left-hand end of the tracker, which had a control opening, and which block was adjusted so that the control opening would come just under the left-hand surface of the music sheet. This connected by tube to control another valve, which was arranged to connect and disconnect the suction chest through another tube, with another actuating pneumatic arranged on the left-hand end of the tracker and connected to the left-hand end of the shaft of the music sheet roll, so that if the perforated music sheet, during its travel, should wander to the right, the left-hand control opening would be uncovered, the left-hand valve open the suction chest connected to the left-hand actuating pneumatic, which would then be deflected to pull the music sheet to the left, and hence adjust the traveling music sheet to the left to remedy its deflection to the right.

In this way, the surface of the sheet was employed to cover and uncover control openings. In the construction of the O'Connor device, the mechanism is duplicated, and as one mechanism is employed for adjustment to the right and another mechanism for adjustment to the left, the sheet music expands and contracts with changes in the temperature and humidity, requiring adjustment of the blocks, and these adjustments are difficult, as they have to be relative to each other

to account for the expansion and contraction, and also have to be made relative to the apertures in the tracker to keep the music sheets normally and in proper relation thereto. Then, too, there was some variation in the width of the music sheet during its entire length, and there was danger that the device might not work properly, as its operation depends upon the operation of the two blocks to a given width of music sheet. In other words, the O'Connor device provided a double surface method of control by means of the two guiding devices, one on each side. When Thomson, the inventor of the patent in suit, at one time purchased an organ for his home, and found that the O'Connor device did not track properly the music sheet over the tracker bar, and did not serve the purpose of his automatic playing organ, he set about to invent a device which would. He has succeeded, and in our opinion he has invented an improvement over O'Connor, and has contributed to the art.

The claims in suit are as follows:

"1. A music sheet guiding device comprising means normally operative to move the sheet laterally in one direction (the spring) and means including a part bearing against an edge of the sheet movable laterally thereby for governing said sheet-moving means (lever valve, and actuating pneumatic).

"2. A music sheet guiding device comprising pneumatically actuated means (actuating pneumatic and spring) for moving the sheet laterally, a movable part (lever) against which the sheet bears when laterally deflected from its path, and connections between said movable part and said moving means for controlling the latter said connections including a pneumatic valve moved by said part.

"3. A music sheet guiding device comprising means normally operative to move the sheet laterally in one direction (the spring), a movable part (lever) against which the sheet bears when moved by said means from its path, and connections between said movable part and said sheet-moving means (valve and actuating pneumatic) for controlling the latter.

"4. A music sheet guiding device comprising means including an actuating pneumatic and suitable connections (levers, links, etc.) for moving the sheet laterally, and means including a movable part (lever) against which the sheet bears when deflected from its path and a valve connected to said movable part, and pneumatic connections (tubes and connections) between said valve and said actuating pneumatic for governing the latter."

The inventor states:

"My invention relates to music sheet guiding devices such as are used in mechanical instrument players and mechanical players for musical instruments. Such players are ordinarily controlled by a perforated music sheet moving over the tracker.

"The object of the present invention is to guide the sheet laterally during its longitudinal movement, so as to insure the exact registration of the perforations in the sheet with the corresponding ducts in the tracker. or, more broadly speaking, to insure such relative movement of the sheet and the tracker transversely of the path of the sheet as will secure their proper alignment. It is of course obvious that any considerable lateral deviation of the music sheet would interfere with or destroy the proper rendition of the music."

The patent describes the working of the invention of the device on the pressure system, but also points out that the invention can be employed just as well on the suction system. It is the control of the sheet, by guiding it from one side alone, that is claimed to be the improvement. The inventor claims only that he has invented a "certain new and use-

ful improvement in music sheet guiding devices." The first element of construction consists of a compression spring placed in the bearing, which supports the left-hand plunger for the left-hand end of the music roll. This spring is under compression and is normally operative to move the music sheet in one direction. Pushing on the left-hand side of the music sheet roll, it always tends to push the music sheet to the right so that when there is no pneumatic pressure in the instrument, the music sheet roll and the music sheet is pushed to the extreme position to the right. Likewise, there is a compression spring on the left hand axis of the winding roll. There is an actuating pneumatic having connections to the shaft, which carries the right-hand end of the music sheet roll. The left-hand wall of the actuating pneumatic is movable, and the connections of the music sheet roll extend from the movable wall. This actuating pneumatic has a light pull spring tending to deflate the same, which spring thus makes the pneumatic double acting; that is, when pressure is admitted to the pneumatic, it expands to the left and pulls on the spring, and when the pressure is discontinued, and the pneumatic connects to the atmosphere, the spring pulls the pneumatic to the right and deflates the same. The spring thus acts in conjunction with the compression spring at the left of the music sheet roll, and acts to move the music sheet to the right.

The actuated pneumatic is made of a size so that, when it is called into operation for making an adjustment, its operative force is greater than the action of the compression spring. There is a normally operative force in springs to push the music sheet roll and hence the music sheet to the right, which normally operative force is opposed by a superior force; that is, the inflation of the actuating pneumatic. The music sheet moves in space, being normally impelled to the right by the action of the spring, and being pushed to the left by the actuating pneumatic when called into operation. The device then provides a movable member bearing against the edge of the music sheet and carrying a pneumatic valve for governing the operation of the actuating pneumatic. This member bearing against the edge of the music sheet comprises a pivoted lever having a shoe, against which the left-hand edge of the music sheet rubs. This lever carries a pneumatic valve at its inner end, and a light spring is employed to pull the pneumatic towards its seat. Pneumatic connections are arranged between the valve and the actuating pneumatic. These parts are so combined that, when the music sheet is too far to the right, the pneumatic valve is pulled towards its seat, and the operative pneumatic pressure is connected to the actuating pneumatic. As a result of this combination, the actuating pneumatic operates the music sheet to the left until the valve is open sufficiently to stop this action of the pneumatic. This provides that the music sheet roll is always impelled to the right by the action of the normally operative spring, and pushed to the left against the spring by the operation of the actuating pneumatic, and this later operation is governed by the left-hand edge of the music sheet rubbing on the moving part and operating the pneumatic valve.

By this combination the operation is governed by one edge of the traveling music sheet rubbing on the movable part carrying the pneu-

matic valve. Therefore, if the music sheet during its longitudinal forward travel should slip to the right, the left-hand edge of the music sheet would move away from the movable part, and the pneumatic valve would be pulled towards its seat by the light spring pulling on the valve bringing the actuating pneumatic into operation, so that it will expand to push the music sheet to the left to its correct position, and thus cure its deflection to the right; and, on the other hand, if the music sheet during this longitudinal forward travel should slip to the left, the left-hand edge of the music sheet, pushing on the movable part, will hold the valve in a wide-open position, and will cut the actuating pneumatic out of operation, so that the spring will push the music sheet to the right, back to its normal position. This provides the proper guiding during its longitudinal forward travel.

By this combination and operation, an improvement over O'Connor's double surface method of control was established. It avoids the duplication of parts, and there is no lost motion in connections as the spring or springs are pushed. Since it operates entirely from one edge of the music sheet, it is only necessary to set one pivoted lever in proper position relatively to the tracker bar. If the music sheet varies in width, the operation will not be materially interfered with. It operated by contact of the traveling edge of the music sheet with a movable part. A very small lateral movement of the music sheet will move said part, whereas the movement of the music sheet required in O'Connor's device must be enough to cover one of the control openings a considerable distance.

That it has been an improvement over the O'Connor device is best exemplified by the results obtained. The witnesses say it worked successfully and satisfactorily, and there were some 30,000 sold beginning June, 1911. It should be given a fair construction and a reasonable range of equivalents. Dowagiac Mfg. Co. v. Minn.-Moline Plow Co., 118 Fed. 136, 55 C. C. A. 86; Nat. Hollow Brake-Beam Co. v. Interchangeable B. Co., 106 Fed. 693, 45 C. C. A. 544.

The appellee's guiding device, constructed under the Dickinson patent, No. 1,194,725, works on the suction system, instead of on the pressure system. Thomson, however, in his patent, says this is immaterial, and points out that one familiar with the art may readily change to the suction system. In appellee's device, the first element consists of a compression spring placed in the bearing which supports the left-hand plunger or shaft for the left-hand end of the music sheet roll. The spring is under compression and is normally operative to move the sheet in one direction. This compression spring, pushing on the left-hand shaft of the music sheet roll, always tends to push the music sheet to the right. When there is no suction in the instrument, the sheet roll and the music sheet is pushed to an extreme position to the right. This is the same action as the spring in the Thomson device.

In appellee's device, the next operative element is the actuating pneumatic having connections to the shaft which carries the right-hand end of the music sheet roll. It has three walls, the two outer walls of which are movable, and are connected by a link to move as one part, and the connections to the music sheet roll extend from the right-hand wall.

There are two bellows or chambers in appellee's actuating pneumatic. The bellows which operates to adjust the music sheet roll is the left-hand bellows. The appellee's actuating pneumatic operating by suction, when this adjustment is made, will move to the right; hence any connections from the actuating pneumatic to the shaft of the music sheet; a chain motion device, a cam, is employed. The actuating pneumatic moving to the right by suction, and having chain motion connections to the right-hand end of the music sheet roll, is the same mechanically as Thomson's actuating pneumatic expanding to the left under pressure and connected by direct connections to the right-hand end of the music roll. It makes the pneumatic double acting, so that, when the operating section is disconnected from the left-hand bellows of the pneumatic, the right-hand bellows moves the parts to the left to inflate the left-hand bellows; the right-hand bellows thus acts in conjunction with the compression spring at the left of the music sheet roll, and acts to draw the music sheet to the right. This pneumatic is of such a size, when called into operation for making an adjustment, its operative force is greater than the action of the compression spring to the left of the music sheet roll. When the actuating pneumatic thus operates to make an adjustment, it pushes the music sheet roll and stores energy in the spring. Therefore, there is normally an operative force, the spring normally operative to push the music sheet roll to the right, which normally operative force is opposed by superior force, the deflection of the left-hand bellows of the actuating pneumatic, the normally operative force and the actuating pneumatic force opposed to each other.

When the music sheet floats in space, being normally impelled to the right by the action of the spring, it is pushed to the left by the actuating pneumatic when called into operation. The appellee's device then arranges a movable part bearing against the edge of the music sheet and carrying the pneumatic valve for governing the operation of the actuating pneumatic. The part bearing against the edge of the music sheet and movable laterally thereby comprises a pivoted lever having a surface against which the left-hand edge of the music sheet rubs. This lever carries the pneumatic valve at its inner end, and the light spring is arranged to pull the pneumatic valve toward its seat. Pneumatic actions are arranged between the valve and the actuating pneumatic. The parts are combined, so that, when the music sheet is too far to the right, the pneumatic valve is pulled toward its seat and the operative pneumatic suction is connected to the left-hand bellows of the actuating pneumatic; thus the same result is obtained as provided for in the Thomson patent.

In appellee's apparatus, only one relay is employed in the connection between the pneumatic and other actuating parts, while the Thomson employs two relays in the connection between his pneumatic valve and the actuating pneumatic. A relay is a mechanism employed when desired in pneumatic connections to amplify the action, so that a small gust of air is amplified up into a larger gust. The relays are added parts increasing the efficiency of the operation. There is a slight oscillating or wavering of the music sheet when it is traveling in corect

position on the tracker. It is about one two-hundredths of an inch, as testified to; it is variously estimated as from one two hundred and twenty-fifth to one two hundred and fiftieth of an inch. It is so slight as to be immaterial, because it is much less than the bridge between the apertures and the tracker, which is usually one-fiftieth of an inch. Whether or not the relays are used is merely a matter of manufacture. The appellant used the Thomson device with and without them. With the use of relays, a quicker action is obtained, and the cost of the relay is about from fifty cents to one dollar.

We do not think a proper comparison between two devices involves the degree of trembling or wavering of the music sheet when traveling correctly in normal position. The proper comparison is between the devices when each functions to adjust the traveling music sheet to correct a sidewise deflection. To attempt to distinguish the devices as the appellee does, by calling the operation of the appellant's device that of the law of the pendulum, and that of the appellee's the law of the bleeding port, based upon the immaterial trembling balance in Thomson's device, we do not think sound. The test is whether the appellee's apparatus employs the combinations which Thomson has invented.

[2] We think that claims 1, 2, 3, and 4 have been infringed, and that the parts specified in these claims are identical in appellee's devices, and operate the same way to produce the same result. We are of the opinion that Thomson was the first to grasp the idea that edge control could be used for music sheet, and that such control could be made from the one edge only. His invention is not anticipated by the O'Connor patent, but is an improvement thereon, and is entitled to take its place in the art under all rules of fair construction. We are of the opinion that the appellant is not guilty of laches, and may maintain this suit as late as May, 1916, at a period of some four or five years after the appellee placed its device complained of, on the market. There is no rule of law that requires a patentee to sue infringers upon all the patents he owns at the same time, or that deprives him of equitable relief if he delays his suit for the period specified here. Ide v. Trorlicht, 115 Fed. 137, 53 C. C. A. 341; Edison, etc., Co. v. Sawyer, etc., Co., 53 Fed. 592, 3 C. C. A. 605.

Judgment reversed.

WARD, Circuit Judge (dissenting). In Autopiano Co. v. American Player Piano Co., 222 Fed. 276, 138 C. C. A. 38, we held the O'Connor patent, second reissue, 13,398, to be entitled to a most liberal range of equivalents as a pioneer. I think edge control is therefore to be regarded as equivalent to surface control. Persons who had acquired intervening rights while the first reissue was in force, of whom the defendant is one, are entitled to immunity for this reason.

In Autopiano Co. v. Claviola Co., 234 Fed. 314, 148 C. C. A. 216, we held the O'Connor patent good against edge control devices operated pneumatically by O'Connor's means.

The present suit is upon Thomson, 841,356, which is a method of edge control operated, in my opinion, by the same means as O'Connor, and therefore an infringement. But Thomson is an improvement and

patentable as such, so that, if the defendant uses an equivalent device to his, it infringes.

I think the District Judge was right in holding that the defendant's device is different. Thomson uses a spring to shift the music ·sheet roll to the right, and pneumatic bellows to shift it to the left. There is a constant struggle between these two forces; the one alternately overcoming the other and so causing a continual oscillation of the music sheet as it travels longitudinally. The defendant's device, on the other hand, shifts the music sheet roll in both directions by the pneumatic bellows, and there is no oscillation of the sheet while it travels longitudinally. True, there is a spring at the left end of the music roll, but it is not intended to function in the shifting, and if it actually does so its co-operation is negligible. Such a spring is used on all piano players, however operated, for the mere purpose of enabling the music sheet roll to be put in and taken out of the structure.

Therefore I think the defendant does not infringe, and the decree should be affirmed.